**SYNERGY BILLING, LLC and
MICHAEL JAYSON MEYER,**

      **Plaintiffs,**

v.                                   Case No: 6:17-cv-00929-Orl-31DCI

**PRIORITY MANAGEMENT GROUP,
INC. and CARLO CIOFFI,**

      **Defendants.**

## ORDER

This matter comes before the Court on the Motion to Quash and Motion to Dismiss (Doc. 3) filed by Defendant Carlo Cioffi; the Motion to Dismiss (Doc. 11) filed by Defendant Priority Management Group; and the Responses (Docs. 20, 21) filed by Plaintiffs Synergy Billing LLC and Michael Jayson Meyer.

## BACKGROUND[1]

The gravamen of the Complaint in this action is that Defendants—Priority Management Group Inc. ("**PMG**") and Carlo Cioffi ("**Cioffi**")—engaged in a campaign to defame and discredit Plaintiffs—Synergy Billing, LLC ("**Synergy**") and Michael Meyer ("**Meyer**")—by accusing them of participating in a fraudulent scheme committed by Johnathan Dunning ("**Dunning**"), a non-party to this action. (Doc. 2).

---

[1] These facts are taken from the Complaint, the allegations of which the Court must accept as true when considering a motion to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).

I.      **The Parties**

Plaintiff Meyer is a resident of Ormond Beach, Florida and the CEO of Synergy, a revenue cycle management ("**RCM**") firm that works exclusively with Federal Qualified Health Centers ("**FQHCs**"). (*Id.* ¶ 2–3). Defendant Cioffi is a resident of Lincoln, Rhode Island and the former Vice President of PMG, which also focuses exclusively on providing RCM for FQHCs. (*Id.* ¶¶ 4–5).

II.     **Meyer Becomes a Victim of Dunning's Fraudulent Scheme**

Prior to the formation of Synergy, Meyer was the CEO of a medical billing company named WorkSmart MD, Inc. ("**WorkSmart**"). (*Id.* ¶¶ 14–15). In 2005, Dunning, the former CEO of Birmingham Health Center ("**BHC**"), approached Meyer and requested that WorkSmart perform billing for BHC. (*Id.* ¶ 14). "As WorkSmart . . . achieved great success for [BHC]," Meyer created Synergy as a d/b/a of WorkSmart. (*Id.* ¶ 15). Dunning never became an employee, owner, or shareholder of Synergy. (*Id.* ¶ 16).

In 2008, Dunning approached Meyer again and suggested that they work together to expand RCM for FQHCs in Alabama. (*Id.*) Dunning then formed his own two companies—Synergy Billing Solutions and Synergy Medical Solutions. (*Id.*) Despite promising to work together, however, Dunning brought in no new clients. (*Id.*)

Meyer continued to provide billing services to BHC through 2012, but discontinued service when he received no payment for his work. (*Id.* ¶ 17). Sometime thereafter, Meyer received a 1099 from BHC and was "shocked" to see an amount far greater than the revenue he collected from BHC. (*Id.*). Around that same period, the United States Attorney's Office ("**Government**") contacted Meyer and the FBI interviewed him in reference to Dunning. (*Id.*). The FBI then "informed Meyer that Dunning [had] been receiving payments for Meyer's services," and the U.S. Department of

Justice "identified Meyer as a victim of Dunning's scheme" to pocket federal dollars. (*Id.* ¶¶ 17, 18).

In February 2015, the Government charged Dunning with over one hundred counts of federal crimes, including wire fraud, bank fraud, money laundering, and conspiracy. (*Id.* ¶ 18). To assist the Government with its case, Meyer testified against Dunning, who was convicted of ninety-eight charged counts in 2016. Dunning is now serving an eighteen-year sentence in federal prison and must repay $13.5 million in restitution. (*Id.* ¶ 20).

### III. Defendants Accuse Plaintiffs of Being a Part of Dunning's Fraudulent Scheme

During the pendency of Dunning's case, Synergy acquired a contract to provide Northeast Florida Health Services ("**NFHS**") with RCM services. (*Id.* ¶¶ 22–23). Synergy was awarded the contract over its competitor, PMG. (*Id.*). After procuring the contract with NFHS, Plaintiffs learned that Cioffi had instigated a smear campaign aimed at tarnishing their reputations.[2] (*Id.*).

In July 2015, Cioffi emailed several NFHS representatives, including Todd Aldrich ("**Aldrich**"), and falsely alleged that Synergy had been a part of Dunning's fraudulent scheme. (Doc. 2, ¶¶ 22–23; Doc. 2-1 at 1–2). Specifically, Cioffi stated:

> I wanted to send one last email and say [t]hank you for all the time you folks invested in working with PMG to see if we are a fit for your organization. I heard from [Aldrich] that you folks went in another direction and decided that PMG was not a fit and why.
>
> I shared with [Aldrich] that I would still try to connect with the leadership at Samuel Rodgers. The call would be less of a reference on PMG but more of what you might avoid or pitfalls to avoid in working with . . . their old vendor who will be your vendor going forward.
>
> Again, I can't say why they switched vendors, they can share that with

---

[2] Plaintiffs allege that for several months in the beginning of 2015, Synergy's staff began to hear rumors that a competitor was accusing Synergy of being associated with Dunning's scheme, but Synergy did not know which competitor was spreading the rumors. (Doc. 2, ¶ 21).

- 3 -

> you if they are inclined. In addition, I have attached a document that is a HRSA report in which on page 28 they indicate a company named Synergy Billing Solutions coded visits for increased reimbursement.
>
> I have also attached a PDF in which . . . [the] US Government has a case against Jonathan Dunning and his firms - one of which is named Synergy Billing Solutions. I know that folks at that firm indicate they are not the same firm. We have spoken to the Attorney General[']s [O]ffice in Alabama and they indicate they are the same firm.
>
> My hope is that this does not come across as sour grapes for PMG not being awarded the work at [NFHS] but rather as a buyer beware message. Best of luck going forward and providing your service area the health care they deserve.

(Doc. 2-1 at 1–2 (the "**NFHS Email**")).

Upon receipt of Cioffi's email, Aldrich contacted Synergy, seeking to discuss Cioffi's accusations. (*See id.* at 1; Doc. 2 ¶ 23). Shortly thereafter, NFHS terminated its relationship with Synergy. (Doc. 2, ¶ 23). Even after NFHS cut ties with Synergy, Cioffi continued to provide false information about Plaintiffs to the media, government officials, and the National Association of Community Health Centers (**"NACHC)** [3] —the leading national advocacy organization for community based health centers. (*Id.* ¶¶ 13, 28–30, 32–33).0

Using the pseudonym "Ronald Tides, Jr.," Cioffi sent an email to Clayton Park ("**Park**"), the business editor of the Daytona Beach News-Journal, on May 12, 2014, insisting that Plaintiffs were working with Dunning and that Dunning had in interest in Synergy.[4] (Doc. 2-1 at 5; Doc. 2 ¶ 30). When Park doubted Cioffi's accusations, Cioffi continued to insist that there was a connection and suggested that Park investigate the matter. (Doc. 2-1 at 4). Heeding Cioffi's advice, Park

---

[3] Plaintiffs do not specifically describe the false information that Cioffi allegedly provided to the NACHC. Nor do they explain when or how the false information was delivered.

[4] Plaintiffs did not discover the true identify of "Roland Tides, Jr." until 2017, when Synergy filed a John Doe suit in state court and issued a subpoena to Google. (Doc. 2, ¶¶ 39). According to Google, Cioffi opened a Google account under the pseudonym, Roland Tides, Jr., in August 2015. (Doc. 2-1 at 10).

contacted Jeanette Duerr ("**Duerr**"), Synergy's Vice President of Communications, to inquire whether there was any connection between Synergy and Dunning's company—Synergy Billing Solutions. (*Id*). After Synergy responded to Park's inquiry, the Daytona Beach News-Journal ultimately decided not run with Cioffi's story. (Doc. 2, ¶¶ 31, 32).

Cioffi then used the same pseudonym to send emails to three government officials: Joe Forte ("**Forte**"), the City Manager of Holly Hill; John Penny, the Mayor of Holly Hill; and Rob Ehrhardt, the Director of Economic Development for Volusia County. (*See* Doc. 2, ¶ 32). In his email to Forte, Cioffi claimed that Meyer was associated with Dunning. (Doc. 2-1 at 9). He also claimed that he had no interest in the purported relationship between Meyer and Dunning, but that he was simply outraged by "Dunning and all his associates" because his family was treated at various health centers affected by Dunning's criminal acts. (*Id.*) Cioffi then concluded his email by criticizing Forte's handling of the matter and warned Forte that he had sent emails to every local and national news outlet in an effort "to expose all corruption." (*Id.*).

## IV. Synergy's Relationship with the NACHC is Fractured

In addition to the false and defamatory statements spread by Defendants, Plaintiffs allege that the NACHC began "circulating negative comments in the industry in an attempt to discredit [Plaintiffs] and to tie Synergy [them] to Dunning." (Doc. 2, ¶¶ 26). The NACHC also attempted to persuade one of Synergy's prospective clients to partner up with PMG. (*Id.* ¶ 24). Plaintiffs allege that a former employee of PMG—Gervean Williams—began working for the NACHC in March of 2016, "which is right around the time that Synergy learned that NACHC was pushing certain community health centers toward PMG." (*Id.* ¶ 25).

Synergy lodged numerous complaints with the NACHC, but the NACHC assured Synergy that it was against their policy to promote one member over another or to disparage a member. (*Id.*

¶ 26). Despite the NACHC's purported policy, "the negative comments continued" and one of Synergy's potential clients stopped communicating with Synergy. (*Id.*). In July 2016, "Synergy lost two potential accounts due to the actions of PMG, Cioffi, and NACHC." (*Id.* ¶ 27). A month later, the NACHC cancelled Synergy's reserved space at the largest industry conference and assigned Synergy a booth secluded from the attendees. (*Id.* ¶¶ 34, 35). "Synergy eventually learned that" the NACHC took this action "so that it could further investigate the relationship between [Plaintiffs] and Dunning." (*Id.*). Duerr made several attempts to speak with the Chief Operating Officer of the NACHC to resolve its concerns, but her attempts were unsuccessful. (*Id.* ¶ 37).

## V. This Action

Based on the foregoing facts, Plaintiffs brought suit against Defendants asserting claims for "defamation libel" (Count I), "defamation *per se*" (Count II), "tortious interference with advantageous business relationships" (Count III), "civil conspiracy" (Counts IV and V), and "violation of Florida's Deceptive and Unfair Trade Practices Act" (Count VI). Defendants have filed separate motions seeking to dismiss Plaintiffs' claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 3, 11). In addition, Cioffi moves to dismiss the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and to quash service of process. (Docs. 3).

CIOFFI'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

## I. Legal Standard for 12(b)(2) Motions

To determine whether the court has personal jurisdiction over a defendant, the court must engage in a two-step inquiry. First, the court must determine whether there is a basis for jurisdiction under Florida's Long-Arm Statute ("**FLAS**"). *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990). Second, the court must determine whether its exercise of jurisdiction comports with the Due

Process Clause of the Fourteenth Amendment such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citation omitted).

The plaintiff bears the initial burden of alleging sufficient facts in its complaint, which, if accepted as true, would establish a prima facie case of personal jurisdiction over each defendant. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). A defendant may then challenge the exercise of personal jurisdiction by submitting a sworn affidavit, testimony, or other evidence refuting the plaintiff's claim of jurisdiction. *Brennan v. Roman Catholic Diocese of Syracuse NY, Inc.*, 322 Fed. App'x. 852, 854 (11th Cir. 2009) (per curiam). Upon doing so, the plaintiff bears the ultimate burden of coming forward with sufficient evidence supporting the exercise of personal jurisdiction over the defendant. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006).

**II.      Discussion**

    **A.      Florida's Long-Arm Statute**

Cioffi asserts that the Court cannot exercise personal jurisdiction over him because Plaintiffs have failed to plead any claims that fall within the ambit of FLAS and because he lacks sufficient minimum contacts with Florida. (Doc. 13 at 4–5). Plaintiff counters that the Court has personal jurisdiction over Cioffi pursuant to subsection 48.193(1)(a)(2) of the FLAS, which confers personal jurisdiction over a defendant for any cause of action arising from the defendant's commission of a tortious act within Florida.[5] *See* Fla. Stat. § 48.193(1)(a)(2).

---

[5] In addition, Plaintiffs alleged that the Court has personal jurisdiction over Cioffi pursuant to Florida Statute section 48.193(1)(a)(6) because Cioffi "caused or threatened to cause injury to persons or property within the state arising out of acts out of the state, while engaged in solicitation and service activities within this state." (Doc. 2, ¶ 6).

"The commission of a tort for purposes of establishing long-arm jurisdiction does not require physical entry into the state, but merely requires that the place of injury be within Florida." *Future Tech. Int'l, Inc. v. Tae II Media, Ltd.*, 944 F. Supp. 1538, 1558 (S.D.Fla.1996); *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). As a corollary "[c]ommitting a tortious act within Florida under section 48.193(1)[(a)(2)] can occur by making telephonic, electronic, or written communications into this [s]tate, provided that the tort alleged arises from such communications." *Wendt v. Horowitz*, 822 So.2d 1252, 1253 (Fla. 2002).

As discussed *infra*, Plaintiffs have sufficiently alleged that Cioffi committed several tortious acts in Florida by, *inter alia*, emailing false information to one of Synergy's Florida clients. Cioffi's conduct caused Plaintiffs to sustain injuries in Florida, as they reside in this state and conduct business here. In his affidavit, Cioffi does not deny emailing Synergy's client in Florida. Nor does he deny that the injurious effects of his email were felt in this state. Instead, Cioffi states that he: (1) "did not collude or conspire with anyone, inside or outside PMG, against [Synergy]" and (2) did not believe the statements in his emails were false. (Doc. 3, ¶¶ 14–15). However, these statements go to the merit of Plaintiffs' claims, which the Court need not address at this stage in the proceedings.

Construing all reasonable inferences in favor of Plaintiffs, the Court therefore finds that Cioffi is subject to personal jurisdiction in Florida.

### B. Due Process

Having determined that specific jurisdiction is appropriate under FLAS, the Court must next consider whether the exercise of specific jurisdiction comports with due process. To determine whether exercising specific jurisdiction comports with due process, courts employ a three-part test, which examines:

> (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the

nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

*Louis Vuitton*, 736 F.3d at 1355 (citation omitted). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.*

### 1. *Relatedness*

Given that Plaintiffs claims relate to, and arise out of, Cioffi's alleged contact with entities and individuals in Florida, the Court finds that the first prong is met.

### 2. *Purposeful Availment*

In intentional torts cases, such as this one, purposeful availment can be determined through application of the "effects test," which was developed in *Calder v. Jones*, 465 U.S. 783 (1984). *See Louis Vuitton*, 736 F.3d at 1356–57. To satisfy the effects test, the tort must have: "(1) [been] intentional; (2) [been] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Lovelady*, 544 F.3d at 1286.

Here, Plaintiffs assert that Cioffi committed multiple torts by intentionally and purposefully directing false communications about them to entities and individuals in Florida. By directly targeting Plaintiffs, Cioffi aimed his tortious conduct at Florida, and by virtue of that fact, should have anticipated that any resulting injuries would occur in this state. The Court therefore finds that Plaintiffs have satisfied the purposeful availment prong.

### 3. *Fairness*

Next, the Court must determine whether exercising personal jurisdiction over Cioffi would offend notions of fair play and substantial justice. In making this consideration courts consider:

> (a) the burden on the defendant, (b) the forum State's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (e) the shared interest of the several States in furthering fundamental social policies.

*McGow v. McCurry*, 412 F.3d 1207, 1216 (11th Cir. 2005) (citation omitted).

The Court does not find that exercising personal jurisdiction over Cioffi would offend notions of fair play and substantial justice. First, there is no indication that adjudicating this case in Florida would be unconstitutionally burdensome for Cioffi. Second, "Florida has a very strong interest in affording its resident[ ] a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida." *Lovelady*, 544 F.3d at 1288. Third, Plaintiffs have an interest obtaining relief in Florida, where their injuries occurred. *Id.* (explaining that a "plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the Florida plaintiff, is not required to travel to the nonresident's state of residence to obtain a remedy"). Lastly, the Court cannot conceive of any interest of the interstate judicial system in obtaining the most efficient resolution of controversies, or any interest of the states in furthering shared substantive policies that will be thwarted by this decision.

For the foregoing reasons, Cioffi's motion to dismiss for lack of personal jurisdiction will be denied.

### MOTION TO QUASH SERVICE OF PROCESS

Cioffi also moves to quash service of process, on grounds that Plaintiffs' proof of service affidavit is "neither notarized nor verified" as mandated by section 48.194 of the Florida Statutes. (Doc. 13 at 6; Doc. 1-1 at 57). However, Plaintiffs have since filed an "Out of State Proof of Service" showing that Plaintiff was properly served on April 26, 2017. (*See* Doc. 18). The affidavit of the

serving officer is notarized and states the time, date, manner, and place of service. Accordingly, Cioffi's motion to quash will be denied.

### DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

**I.      Legal Standard for 12(b)(6) motions**

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows [a] court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Id.* at 678.

Under Rule 12(b)(6), a party may request dismissal of a pleading that falls short of these pleadings requirements. In resolving such motions, courts limit their consideration to the face of the complaint, its attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–23 (2007). Dismissal is warranted if, assuming the truth of the factual allegations of the complaint in a plaintiff's favor, there is a dispositive legal issue which precludes relief. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

Here, PMG generally argues that the Complaint should be dismissed in its entirety, or that Plaintiffs should be required to provide a more definite statement, because Plaintiffs "have made no attempt to distinguish between each defendant and simply lump them together as though they share

the same identity." (Doc. 11 ¶ 18). The Court is unpersuaded. Although the Complaint is not a model of clarity, the Court finds that it meets the minimum pleading requirements and provides Defendants with requisite notice of the claims brought against them. Moreover, the lumping together of Defendants does not create ambiguity because it is clear that Plaintiffs are alleging that both of the Defendants committed the same wrongful acts. Accordingly, the Court rejects PMG's argument.

## II. Discussion

### A. Defamation

Plaintiffs assert a claim for defamation *per quod* (Count I)[6] and defamation *per se* (Count II). (Doc. 2, ¶¶ 40–56). Defendants move to dismiss both claims.

To state a claim for defamation, "a plaintiff must allege that (1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3d DCA 1999). Under Florida law, "[d]efamation encompasses both libel and slander." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 n.11 (S.D. Fla. 2006) (citation omitted).

Under Florida law, statements can be defamatory *per se* or defamatory *per quod*. S*ee Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999). A statement is defamatory *per se*, "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA) (citations omitted). In other words, the statements are "so obviously defamatory" and "damaging to [one's] reputation" that they "give[ ] rise to an

---

[6] Plaintiffs do not specify whether Count I is a claim for defamation *per quod* or *per se*. (*See* Doc. 2 at 10). However, based on the allegations contained therein, the Court construes Count I as a claim for defamation *per quod*.

absolute presumption both of malice and damage." *Wolfson v. Kirk,* 273 So.2d 774, 776 (Fla. 4th DCA 1973); *Campbell v. Jacksonville Kennel Club, Inc.,* 66 So.2d 495, 497 (Fla.1953).

In an action for defamation *per se*, consideration is given only to the "four corners" of the publication, and the language used should be interpreted as the "common mind" would normally understand it. *O'Neal v. Tribune Co.*, 176 So. 2d 535. The "common mind rule simply means that the words should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard [the] same." *Wolfson,* 273 So.2d at 778.

A statement is defamatory *per quod* if it requires the plaintiff to allege extrinsic facts, such as innuendo, to take on defamatory meaning. *Hoch*, 742 So.2d at 457. Because the harm arising from such a statement is not readily apparent, the plaintiff is required to plead special damages. *Id.* Importantly, plaintiff must show that "its special damages proximately resulted from the defamat[ory]" statement. *Bobenhausen v. Cassat Ave. Mobile Homes, Inc.*, 344 So. 2d 279, 281 (Fla. 1st DCA 1977).

### 1. Defamation *Per Quod* (Count I)

Plaintiffs allege sufficient facts to state a claim for defamation *per quod.* First, Plaintiffs allege that Cioffi, while acting within the scope of his employment with PMG, sent an email to NFHS claiming that Plaintiffs were linked to Dunning's fraudulent scheme. (Doc. 2, ¶¶ 26–30, 42–43). Second, Plaintiffs allege that these statements were false and that Cioffi made such statements with knowledge of their falsity. (*Id*. ¶¶ 23). Third, Plaintiffs provide several extrinsic facts demonstrating that Cioffi's statements were defamatory in nature. (*Id.* ¶¶ 14–23, 42-43; Doc. 2-1 at 1–2). Finally, Plaintiffs assert that Cioffi's statements caused NFHS to terminate its business relationship with Synergy and caused Plaintiffs to suffer damages in excess of three million dollars.

(Doc. 2, ¶¶ 23, 46).

Accepting these well-pled allegations as true, the Court finds that Plaintiffs have properly pled a claim for defamation *per quod* against Cioffi. Likewise, Plaintiffs have stated a claim against PMG under the theory of vicarious liability. *See Thompson v. Orange Lake Country Club, Inc.*, 224 F. Supp. 2d 1368, 1377 (M.D. Fla. 2002) (explaining that a corporate employer can be held vicariously liable for the acts of its employee when the employee is acting within the scope within the scope of his or her employment).

2. **Defamation *Per Se* (Count II)**

The email Cioffi sent to NFHS also forms the basis for Plaintiffs' defamation *per se* claim. As Plaintiffs point out, when Cioffi's email is construed as the common mind would understand it and without extrinsic facts, it conveys the impression that Synergy is the same firm as the Synergy Billing Solutions, which had: (1) "coded visits for increased reimbursement," and (2) subjected itself to prosecution by the Government. (*See* Doc. 2-1, 1–2). Plaintiffs allege that Cioffi statements were false and that Cioffi knew they were false. (Doc. 2, ¶¶ 23, 49–50). Plaintiffs further allege that Cioffi's statements were defamatory because they: (1) subjected Plaintiffs to distrust, ridicule, and contempt; (2) injured Plaintiffs in the medical billing industry at large; and (3) "attributed to [Plaintiffs'] conduct, characteristics, and conditions that are incompatible with the proper exercise of a lawful medical billing business." (*Id.* ¶¶ 49–50, 52–56).

Based on the allegations of the Complaint and exhibits attached thereto, the Court finds that Plaintiffs have properly pled a claim for defamation *per se* against both Defendants.

**B.** **Tortious Interference (Count III)**

To state a claim for tortious interference with business relationships, a plaintiff must allege: "(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the

defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Gossard v. Adia Servs. Inc.*, 723 So.2d 182, 184 (Fla. 1998) (omission in original) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985)).

In support of their claim, Plaintiffs assert that Defendants intentionally and unjustifiably interfered with the relationship between Synergy and NFHS by accusing Plaintiffs of being part of Dunning's fraudulent scheme. (Doc. 2, ¶¶ 57–62). Plaintiffs also claim that Defendants intentionally and unjustifiably interfered with Synergy's pursuit of several FQHCs. (*Id.* ¶¶ 63–64). In response, Cioffi argues that Plaintiffs have failed to state a claim for tortious interference (*see* Doc. 13 at 8–9), while PMG argues that Plaintiffs claim is barred by the single action rule (*see* Doc. 11 at 11–12).

The Complaint asserts that Synergy had an established business relationship with NFHS. (Doc. 2, ¶ 22–23). Despite having knowledge of that business relationship, Cioffi contacted NFHS, while acting as the Vice President of Sales for PMG, and accused Synergy of being associated with Dunning's fraudulent scheme. (*Id.*) As a result, Synergy lost NFHS as a client. (*Id.*). These facts are more than sufficient to state a claim against Defendants for tortious interference.

The single action rule does not bar Plaintiffs' properly pled claim. The single action rule applies to "multiple actions when they arise from the same publication upon which *a failed defamation claim is based*." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 208 (Fla. 4th DCA 2002) (emphasis added); *Ovadia v. Bloom*, 756 So.2d 137, 141 (Fla. 3d DCA 2000). Here, Plaintiffs' claim for tortious interference does not arise from the same publication as a

failed defamation claim. As explained *supra*, Plaintiffs have adequately pled claims for defamation *per se* and *per quod*. Therefore, application of the single action rule is inappropriate.[7]

## C. Civil Conspiracy (Counts IV and V)

In Counts IV and V, Plaintiffs assert that Defendants—Cioffi and PMG—conspired to defame them and to interfere with the advantageous business relationships Synergy had with several FQHCs. (Doc. 2, ¶¶ 66–77). As currently pled, however, Plaintiffs claims are barred by the intracorporate conspiracy doctrine, which "holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).

In their Response, Plaintiffs argue that they have alleged a conspiracy between Defendants and the NACHC. Notably, however, the Complaints lacks sufficient facts from which the Court could reasonably infer that the NACHC conspired with Defendants to defame Plaintiffs or to interfere with Synergy's business relationships. At most, the Complaint alleges that NACHC engaged in parallel conduct by circulating false information in an attempt to discredit Plaintiffs. (*See, e.g.*, Doc. 2, ¶¶ 13, 26, 31). But allegations of parallel conduct coupled with bare assertions of conspiracy will not suffice. If Plaintiffs wish to state a claim for conspiracy between the Defendants and NACHC, they must allege facts from which the Court can infer that: (1) the Defendants and the NACHC agreed to do an unlawful act by unlawful means, (2) the Defendants and the NACHC performed an overt act in furtherance of the conspiracy, and (3) Plaintiffs sustained damages as a result of the acts done under the conspiracy. *See Neuman v. Travel Holdings, Inc.*, No. 6:07-cv-

---

[7] For similar reasons, the Court rejects PMG's argument that the single action rule bars Plaintiffs' claims for conspiracy.

1989-ORL-31GJK, 2008 WL 516709, at *3 (M.D. Fla. Feb. 22, 2008) (listing the elements of a claim for conspiracy). Accordingly, Counts IV and V will be dismissed without prejudice.[8]

### D. FDUTPA (Count VI)

In Count VI, Plaintiffs assert a FDUTPA claim against both Defendants. To state a claim under FDUTPA, a party must allege (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).

The central aim of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). Trade and commerce is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8). The statute does not define "unfair and deceptive act or practice," but the provisions of the act are to be "construed liberally." Fla. Stat. § 501.202.

Here, the Complaint alleges that Defendants—while engaged in the trade or commerce of soliciting, providing, and offering medical billing services—committed unfair or deceptive acts by disseminating false statements about Plaintiffs to third parties, including the NFHS. (Doc. 2, ¶¶ 22–23, 28–30, 32–33, 80–82). The Complaint asserts that Defendants made false statements concerning the relationship between Dunning and Plaintiffs in an effort to divert Synergy's existing and potential customers to PMG. (*Id.* ¶ 82). Finally, the Complaint alleges that Defendants actions

---

[8] If, during the course of discovery, Plaintiffs learn of facts supporting a claim for conspiracy between Defendants and NACHC, they may file a motion for leave to amend, adding NACHC as a party.

caused Plaintiffs to suffer actual damages in the amount of at least three million dollars. (*Id.* ¶¶ 23, 83).

Based on the allegations of the Complaint and exhibits attached thereto, the Court finds that Plaintiffs have pled their FDUTPA claim with sufficient specificity to comply with the heightened pleading requirements of Rule 9(b).

PMG moves to strike Plaintiffs' request for injunctive relief due to their alleged failure to show that Defendants' conduct will continue in the future. However, under FDUTPA, there is no requirement that a plaintiff show an ongoing practice or irreparable harm to obtain injunctive relief. The statute clearly provides that "anyone aggrieved by a violation of [FDUTPA] may bring an action . . . to enjoin a person *who has violated, is violating, or is otherwise likely to violate [the] [statute].*" Fla. Stat. § 501.211(1) (emphasis added). Having found that Plaintiffs have stated a claim of a violation of the FDUTPA, Plaintiffs are entitled by statute to seek an injunction. Therefore, PMG's argument lacks merit.

### III.   CONCLUSION

Accordingly, it is

**ORDERED** that Defendants' motions (Docs. 3 and 11) are **GRANTED IN PART** and **DENIED IN PART**. Counts IV and V are **DISMISSED** without prejudice. In all other respects, Defendants' motions are **DENIED**. On or before **November 10, 2017**, Plaintiffs may file an amended complaint. Should Plaintiffs' fail to file an amended complaint, the original Complaint (Doc. 2) will serve as the operative pleading.

**DONE** and **ORDERED** in Orlando, Florida on October 31, 2017.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties